STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-11-157

HENRY SCHMIDT, as Personal
Representative of the Estate of
DOROTHY E. SCHMIDT,

STATE OF MAINE
Cumberland ss Clerks Office

MAR 0 8 2016

RECEIVED

Plaintiff

v.

MELANIE C. RAND, D.O.
and PARKVIEW ADVENTIST
MEDICAL CENTER,

Defendants

ORDER ON PLAINTIFF'S
MOTION FOR NEW TRIAL
AND/OR SANCTIONS

Before the court is plaintiff's motion for a new trial and/or sanctions in his medical malpractice action against defendants Melanie Rand, D.O. and Parkview Adventist Medical Center (Parkview). For the following reasons, the court denies the motion for a new trial and grants the motion for sanctions as to Parkview and its counsel.

## I.   FACTS

Plaintiff filed a notice of claim on March 18, 2011, alleging negligence on the part of Dr. Rand and Parkview in their care and treatment of Dorothy Schmidt in July 2009. Specifically, plaintiff alleged that defendants were negligent in failing to follow up on test results that showed Ms. Schmidt was suffering from a urinary tract infection.

The case proceeded through the prelitigation screening process, and plaintiff filed a complaint on October 10, 2013. The scheduling order set September 10, 2014 as the deadline for discovery. During discovery, plaintiff's counsel served on Dr. Rand a set of interrogatories, one of which asked when Dr. Rand became aware of the results of a urinalysis test performed on Ms. Schmidt. On July 21, 2011, Dr. Rand responded: "To the best of my knowledge I became aware

1

of Ms. Schmidt's July 6, 2009 test results on July 19, 2009." Dr. Rand later gave responses consistent with this statement in her deposition testimony, her reply statement of material facts, and through her counsel via email with plaintiff's counsel.

On September 25, 2014, plaintiff's counsel filed a witness and exhibit list that included as an exhibit "any and all Electronic Medical Record and data/audit trail information." On the night of Friday, May 8, 2015, Dr. Rand's counsel informed plaintiff's counsel by email that she had "reviewed the audit trail with Dr. Rand." According to plaintiff's counsel, this was the first she had heard of any audit trail. The email further stated that the audit trail showed that Dr. Rand "viewed" Ms. Schmidt's urinalysis results on July 7, 2009, and that she "viewed" and "acknowledged" the same results on July 17, 2009. As a result of this information, Dr. Rand's testimony at trial would now be that, although she has no memory of viewing the results on July 7 and 17, her review of the results on those dates would not have prompted her to address them.

On the evening of Saturday, May 9, 2015, Dr. Rand's counsel emailed plaintiff's counsel unsigned amended answers to plaintiff's interrogatories that reflected this change. On the afternoon of Sunday, May 10, 2015, Dr. Rand's counsel emailed to plaintiff's counsel what plaintiff's counsel claims was an incomplete version of the audit trail. A complete version was provided on Monday, May 11, 2015, along with a signed version of Dr. Rand's amended answers. Jury selection occurred that same day.

A trial was held from May 12 through May 18, 2015. The jury returned a verdict unanimously finding that Dr. Rand was not negligent in her treatment of Ms. Schmidt and finding by a vote of 6-3 that Parkview was not negligent in its treatment. Judgment was entered on May 19, 2015. Plaintiff's counsel filed the motion for a new trial and/or sanctions on June 2,

2015. Both defendants opposed the motion. The parties were unable to resolve the dispute following a conference in chambers on October 6, 2015.

## II.   DISCUSSION

### A. New Trial

The justice before whom an action has been tried may, on motion filed not later than 14 days after the entry of judgment, grant a new trial to all or any of the parties and on all or part of the issues. M.R. Civ. P. 59(a). "Upon a motion for a new trial, the movant must show that the jury verdict was so manifestly or clearly wrong that it is apparent that the conclusion of the jury was the result of prejudice, bias, passion, or a mistake of law or fact." *Binette v. Deane*, 391 A.2d 811, 813 (Me. 1978) (citation omitted). "The evidence must be viewed in the light most favorable to the successful party and the jury's verdict must stand unless there is no credible evidence to support it." *Chiapetta v. Lumbermens Mut. Ins. Co.*, 583 A.2d 198, 201 (Me. 1990).

Citing *Sleeper v. Lilley*, plaintiff first argues that he is entitled to a new trial because the new evidence constituted unfair surprise. 2014 Me. Super. LEXIS 91 (June 13, 2014). In *Sleeper*, the court found that allowing the plaintiffs to pursue one of their claims at trial constituted unfair surprise because the procedural history indicated that the claim was no longer part of the case. *Id.* at *11-12. In contrast to *Sleeper*, the alleged unfair surprise in this case did not involve the unanticipated pursuit of an entire cause of action. Plaintiff simply has not shown that the level of prejudice in this case rises to the level of prejudice in *Sleeper*.

In addition, the element of unfair surprise in *Sleeper* was only one factor on which the court relied in granting a new trial. *See id.* at *12 ("This contributes to the court's view that the motion for a new trial should be granted."). The court based its decision on a number of factors, including, among others, potentially improper testimony from plaintiffs' expert witness

3

regarding damages, the admission of testimony from arbitration, and erroneous jury instructions. *See id.* at \*26 (granting a new trial due to prejudicial error "when the issues identified above are considered in combination"). The court's repeated reference to its consideration of the issues in combination suggests that it likely would not have granted a new trial on any one of the issues alone, yet plaintiff here alleges unfair surprise as the sole ground for a new trial.

Plaintiff also argues that the jury committed a mistake of law or fact in its conclusion that Parkview was not negligent. Specifically, plaintiff argues that the jury erred because experts for both plaintiff and defendants testified that patients have the right to receive their test results, and the evidence established that Ms. Schmidt did not receive her results. Expert testimony is not binding on the jury. *Warren v. Waterville Urban Renewal Auth.*, 235 A.2d 295, 305 (Me. 1967). The jury was free to give the testimony as little or as much weight as it saw fit, and the court will not grant a new trial based on plaintiff's belief that the verdict is contrary to this testimony.

B. Sanctions

1. Standard of Review

"In determining the scope of a sanction for a party's violation of our rules of discovery, the trial court should analyze the effect pretrial violations have on the adverse party and also evaluate the purpose the sanctions are to serve." *Longley v. Knapp*, 1998 ME 142, ¶ 7, 713 A.2d 939 (citation omitted). When the court considers imposing sanctions, the factors to be weighed include, but are not limited to, "the purpose of the specific rule at issue, the party's conduct throughout the proceedings, the party's *bona fides* in its failure to comply, prejudice to other parties, and the need for the orderly administration of justice." *Baker's Table, Inc. v. City of Portland*, 2000 ME 7, ¶ 17, 743 A.2d 237. "The court must also consider the purposes to be served by imposing sanctions, including penalizing the noncompliant party, remedying the

4

effects of the noncompliance, and deterring similar conduct by the offending party, as well as by others." *Harris v. Soley*, 2000 ME 150, ¶ 10, 756 A.2d 499.

    2. Parkview

In May 2011, plaintiff's counsel requested the following from Parkview:

> A copy of Parkview Family Health's [1] complete records concerning Dorothy Schmidt, including but not limited to the following: care and treatment records; hospitalist's records; nurses notes; operative reports; physician consultation reports; dietary forms; physical therapy records; x-rays and imaging studies and reports; laboratory reports; physician's orders; pathology materials, including but not limited to slides and other tissue samples; consents; billing and insurance forms; and any and all other documents created or maintained by you and any person employed by you relating in any way to Dorothy Schmidt.

A party must respond to a request for production by either providing the requested documents, allowing for their inspection, or objecting to the request within 30 days. M.R. Civ. P. 34(b). Parkview provided copies of Ms. Schmidt's medical records in July 2011.[2] In November 2011 and June 2012, Parkview filed supplemental responses, which consisted of billing records and additional imaging and radiology reports. None of these responses included the audit trail.

The court finds that the audit trail falls under plaintiff's counsel's request to provide "any and all other documents created or maintained by you and any person employed by you relating in any way to Dorothy Schmidt." The audit trail is a document created by Parkview that details the urinalysis results involved in Ms. Schmidt's treatment. Despite the fact that plaintiff's counsel made this request in May 2011, a complete version of the audit trail was not provided to her until May 11, 2015—four years later and the day on which jury selection began. In addition, Parkview's counsel apparently disclosed the audit trail to Dr. Rand's counsel at some point

---

[1] Plaintiff's counsel mistakenly addressed her request to Parkview Family Health, instead of Parkview. However, because counsel for Parkview Family Health is also counsel for Parkview, counsel recognized the mistake and responded to the request as if it had been addressed to Parkview.

[2] The parties had agreed to a 30-day extension.

5

before it was disclosed to plaintiff's counsel. The late disclosure of the audit trail almost certainly prejudiced plaintiff's counsel in her preparation for trial because it introduced a potentially significant change in the timeline of events. If Dr. Rand first saw the urinalysis results on July 7—and not July 19—that fact could support plaintiff's theory that Dr. Rand was negligent in failing to follow up on the results. Despite the significance of this new information, plaintiff's counsel had at most three days to incorporate it into her preparation before the trial began. The court therefore finds that sanctions are warranted under M.R. Civ. P. 37. *See Reeves v. Travelers Ins. Cos.*, 421 A.2d 47, 50-51 (Me. 1980) (affirming sanctions in part because purpose of discovery rules is to "enforce full disclosure").

Plaintiff's counsel has submitted a letter to the court, which asserts that plaintiff has incurred attorney's fees as a result of: summary judgment briefing; plaintiff's counsel's efforts to search the file for the audit trail, rework her examinations, consult with experts, and brief the current motion; and her attendance at the chambers conference. The court will award attorney's fees only for those fees that are attributable to the opposing party. *See Bank of Am., N.A. v. Falabella*, 2016 Me. Super. LEXIS 10, at *4-5 (Jan. 28, 2016) (declining to award attorney's fees incurred due to moving party's delays). The court finds that the fees incurred during summary judgment briefing, which plaintiff would have incurred even if Parkview had disclosed the audit trail earlier, are not attributable to Parkview or its counsel. Any fees that plaintiff incurred as a result of his counsel's efforts to search the file, rework her examinations, consult with experts, attend the chambers conference, and brief the current motion are, however, the result of the late disclosure, and plaintiff is entitled to an award of those fees.

3. Dr. Rand

Plaintiff's counsel requested the following from Dr. Rand:

6

> A copy of Melanie Rand, D.O.'s complete records relating to Dorothy Schmidt, including but not limited to the following; Care and treatment records; office notes; x-rays and imaging studies and reports; pathology materials, including, but not limited to, slides and other tissue samples; billing records and consultations with other physicians.

The court concludes that this request did not include the audit trail. Unlike the request to Parkview, the request to Dr. Rand did not ask for "any and all other documents" relating to Ms. Schmidt. Further, Dr. Rand claims that she does not have access to the record system with which audit trails are created, and therefore could not have provided the audit trail even if it were included in the request. It is also not clear that Dr. Rand's counsel knew that plaintiff's counsel had not received the audit trail, since plaintiff's counsel had listed "audit trail information" on her exhibit list. The court therefore finds that neither Dr. Rand nor her counsel committed a discovery violation, and plaintiff is not entitled to an award of attorney's fees from them.

## III.   CONCLUSION

The court hereby ORDERS that plaintiff's motion for a new trial is DENIED and plaintiff's motion for sanctions is GRANTED as to Parkview and its counsel. Plaintiff's counsel shall submit within 30 days of this order an affidavit of attorney's fees setting forth the fees plaintiff has incurred as a result of his counsel's efforts to search the file, rework her examinations, consult with experts, attend the chambers conference, and brief the motion for a new trial and/or sanctions.

Pursuant to M.R. Civ. P. 79(a), the clerk is directed to incorporate this Order by reference in the docket.

Dated: _March 8, 2016_

_____
Roland Cole
Chief Justice, Superior Court

7

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-11-157

RAC-CUM-02-17-15

HENRY SCHMIDT, AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF DOROTHY SCHMIDT,

  Plaintiff

            ORDER

v.

CORTNEY LINVILLE, D.O.;
MELANIE RAND, D.O.;
PARKVIEW ADVENTIST MEDICAL
CENTER, AND PARKVIEW
FAMILY HEALTH,

  Defendants

Before the court is the Plaintiff's Motion for Summary Judgment. This case arises from the hospitalizations and treatment of Dorothy Schmidt prior to her death. Plaintiff Henry Schmidt, as personal representative for the estate of Dorothy Schmidt, has alleged negligence that allegedly led to Mrs. Schmidt's death. The case has already proceeded through the mandatory pre-litigation screening process as required pursuant to 24 M.R.S. § 2851 et. seq.

Plaintiff's Complaint asserts four negligence claims: Count I is a negligence claim against Dr. Courtney Linville, Parkview Adventist Medical Center ("PAMC"), and Parkview Family Health ("PFH"); Count II is a negligence claim against Dr. Melanie Rand, PAMC, and PFH; Count III is a negligence claim against Dr. Matthew Mechtenberg[1] and PAMC; and Count IV is a negligence claim against PAMC. Plaintiff has moved for partial summary judgment against

---

[1] Dr. Mechtenberg is not a named defendant, because PAMC has stipulated that Dr. Mechtenberg was its agent acting in the course and scope of his employment when he treated Mrs. Schmidt.

Defendants Dr. Rand and PAMC on the issue of deviation from the standard of care. Both Dr. Rand and PAMC have opposed the Plaintiff's Motion. The court held a hearing on this Motion where the parties were present with the exception of Dr. Rand's counsel owing to a misunderstanding. For the reasons detailed below, the court denies the Plaintiff's Motion as to both parties.

In addition, the court notes that after filing the Motion, the Plaintiff has subsequently moved pursuant to M.R. Civ. P. 56(d) to have the entirety of its statement of material facts admitted as to Dr. Rand. The court denies the Plaintiff's motion, as non-"practicable" and potentially prejudicial to the parties. The Plaintiff's Motion for Summary Judgment is itself on the narrow issue of deviation from the standard of care. For the reasons detailed below, the Plaintiff has not definitively established that either Dr. Rand or PAMC deviated from the standard of care. The court agrees with Plaintiff's argument that many of Dr. Rand's responses failed to comply with Maine Rule of Civil Procedure 56(h)(2). The court notes, however, that this action is distinguishable from *Doyle v. Dept. of Human Servs.*, as Dr. Rand has managed to raise issues of material fact through her properly presented additional statement of material facts. 2003 ME 61, ¶ 11, 824 A.2d 48. Material facts regarding Mrs. Schmidt's condition, the standard of care, and whether Dr. Rand adhered thereto or breached are still in controversy. This is not an action where it is practicable or reasonable for the court to make the type of findings envisioned by Rule 56(d).

## I.    FACTUAL BACKGROUND:

From the outset, the court notes that there is substantial dispute between the parties, in particular between the Plaintiff and PAMC, regarding the relevant facts in this case, as well as the testimony offered by the treating physicians involved in this action. The Plaintiff has

2

presented some testimony from Mrs. Schmidt's treating physician's that blurs the line between evidence of habit or routine practice and expert testimony *See* M.R. Evid. 406, 702. The Plaintiff states that all parties reserved the right to rely on the treating physicians in their expert designations. However, the court was only able to find an expert designation from PAMC among the panel materials, and did not see any other expert designations in the file. PAMC's expert designation with respect to the treating physicians also appears narrower in scope than described by the Plaintiff. Summary judgment is not the appropriate time to decide whether expert opinion testimony is admissible from the treating physicians, especially given the missing expert designations. As a result, some of the disputed testimony is omitted from this factual background and a discussion of said testimony is more appropriate at a later time.

The following facts are gathered from the parties' statements of material facts, oppositions, additional statements of material facts, and replies that were properly supported by citations to the record.[2] [3]

On June 24, 2009, Mrs. Schmidt visited her physician Dr. Cortney Linville, to be evaluated for a scooter. (Pl.'s S.M.F. ¶ 1; PAMC O.S.M.F. ¶ 1.) At that appointment Mrs. Schmidt complained of shortness of breath. (Pl.'s S.M.F. ¶ 1; Rand O.S.M.F. ¶ 1; PAMC O.S.M.F. ¶ 1.) Dr. Linville ordered a number of tests for Mrs. Schmidt. (Pl.'s S.M.F. ¶ 2.) The labs showed that Mrs. Schmidt's hemoglobin and hematocrit levels were low. (Pl.'s S.M.F. ¶ 3.) After she received the lab results, Dr. Linville noted in Mrs. Schmidt's record "'LMPTCB [left message

---

[2] The court notes that the Plaintiff and Dr. Rand have attempted to introduce some medical records without proper authentication. The Plaintiff's statement that certified copies will be presented at trial is insufficient at the summary judgment stage. Where PAMC has opposed the introduction of these records, they are not admissible as to PAMC.
[3] The court notes that the additional statement of material facts presented by Dr. Rand and opposed by the Plaintiff only apply to Dr. Rand, not PAMC, and likewise the additional statement of material facts presented by PAMC and opposed by the Plaintiff only apply to PAMC, not Dr. Rand.

patient to call back] needs admit!'", which indicates that Dr. Linville wanted Mrs. Schmidt to be admitted to the hospital. (Pl.'s S.M.F. ¶ 4.)

On July 6, 2009, Mrs. Schmidt was admitted to PAMC for evaluation, diagnostic testing, and a blood transfusion. (Pl.'s S.M.F. ¶ 5; Rand O.S.M.F. ¶ 5; as qualified by PAMC's O.S.M.F. ¶ 5.) The Emergency Room Report indicates that at the time that she was admitted her chief complaint was symptomatic anemia, and she denied any flank pain or urinary symptoms, was afebrile, denied fever or chills, was well-appearing, and lived independently. (Rand A.S.M.F. ¶ 7.)

Starting at 5:00 p.m. on July 6, Dr. Melanie Rand was the on-call covering physician at PAMC. (Pl.'s S.M.F. ¶ 6.) Dr. Rand is a family medicine practitioner, and in 2009 she performed both office primary care as well as in-patient medicine. (Rand A.S.M.F. ¶ 1; Pl.'s R.S.M.F. ¶ 1.) She testified that for overnights the on-call covering physician conducts the admission and orders appropriate tests, but the physician would only respond to results that are critical enough to be brought to the on-call physician's attention overnight. (Rand A.S.M.F. ¶ 5.) She stated that the hospitalist would take over in the morning and manage the patients' hospital stay, look up test results, and report results to the patient. (Rand A.S.M.F. ¶ 5.) She also stated, however, that if she is with the patient at the time, or the patient is awake, she would report the test results to the patient; under alternative circumstances whether or not she would relay the results to the patient would depend upon the urgency of the situation. (Pl.'s R.S.M.F. ¶ 5.) Dr. Mark Rohrer, Plaintiff's expert witness, opined however, that the ordering physician remains responsible for following-up on test results and thereafter administering appropriate treatment. (Pl.'s R.S.M.F. ¶ 5.)

4

As a part of her diagnostic testing, Dr. Rand chose to obtain a urinalysis for Mrs. Schmidt. (Pl.'s S.M.F. ¶ 6.) There is some dispute among the parties regarding why Dr. Rand ordered the urinalysis.[4] (Pl.'s S.M.F. ¶ 8; Rand O.S.M.F. ¶ 8; PAMC O.S.M.F. ¶ 8.) Dr. Rand's review of systems included that Mrs. Schmidt had experienced memory loss and incontinence. (Pl.'s S.M.F. ¶ 8; Rand O. S.M.F. ¶ 8.)

While Dr. Rand was still the on-call covering physician, Mrs. Schmidt's urine sample was collected on July 7th at 1:45 a.m. and it was received at 1:53 a.m. (Pl.'s S.M.F. ¶¶ 9-10). The urinalysis results would have been available in the electronic medical records within one to three hours. (Pl.'s S.M.F. ¶ 12.)

The urinalysis revealed that Mrs. Schmidt's urine was cloudy, positive for nitrates, contained small leuk esterase, contained occasional squamous cells, contained many bacteria, and had a white blood count of 10-20/hpf. (Pl.'s S.M.F. ¶ 13 as qualified by Rand O.S.M.F. ¶ 13.) In addition, the urinalysis also was negative for blood, negative for glucose, negative for bilirubin, negative for ketone, and there were no red blood cells. (Rand O.S.M.F. ¶ 13.)[5] A urine culture was also completed for Mrs. Schmidt. (Pl.'s' S.M.F. ¶ 17.) A urine culture identifies the types of bacteria present. (Pl.'s S.M.F. ¶ 14 as qualified by Rand O.S.M.F. ¶ 14.)

Dr. Rand has testified that she did not get the lab results, although she also agreed that the urinalysis results would have been available to her in the electronic medical records within one to three hours. (Rand A.S.M.F. ¶ 6; Pl.'s R.S.M.F. ¶ 6; Pl.'s S.M.F. ¶ 12.) Dr. Linville, a co-worker of Dr. Rand's, stated that at times the hospital in-patient lab results would automatically populate their outpatient desktop and at other times the in-patient lab results were not

---

[4] The court notes that Plaintiff's statement of material fact regarding Dr. Rand's motivation for ordering the urinalysis relies on overly speculative testimony. (Pl.'s S.M.F. ¶ 8.)
[5] The urinalysis results are admissible as to Dr. Rand, but they are not admissible as to PAMC. (*See* Rand O.S.M.F. ¶ 13; PAMC O.S.M.F. ¶ 13.)

automatically sent to them. (Rand A.S.M.F. ¶ 9.) PAMC IT made the determination regarding whether the function was turned on or off. (*Id.*) If Dr. Rand received a result regarding one of her patients in the hospital, she would look at the result and press a button indicating that she acknowledged receipt of the result, but she would leave the hospitalist to manage the patient. (Rand A.S.M.F. ¶ 4.)

Dr. Rand also testified that if one of her patients is admitted to the hospital, she notes any test results that are provided to her, but the hospitalist provides all in-patient care and follow-up. (Rand A.S.M.F. ¶ 3; Pl.'s R.S.M.F. ¶ 3). In this case, however, Dr. Rand was unaware of Mrs. Schmidt's urinalysis results until Mrs. Schmidt returned to the hospital on July 19, 2009. (Pl.'s R.S.M.F. ¶ 4; Pl.'s S.M.F. ¶¶ 15-16; Rand A.S.M.F. ¶ 6.)

Dr. Rand's shift ended at 8 a.m. on July 7, 2009. (Pl.'s S.M.F. ¶ 18.) At that point, Dr. Matthew Mechtenberg, the full-time staff hospitalist for PAMC, took over care for Mrs. Schmidt. (Pl.'s S.M.F. ¶ 19). Dr. Mechtenberg testified that a hospitalist cares for a patient from admission to discharge and then turns the patient back over to their physician once they are discharged. (Pl.'s S.M.F. ¶ 20; Rand A.S.M.F. ¶ 16.)

Dr. Rand expected Dr. Mechtenberg to review Mrs. Schmidt's test results when he took over her care. (Pl.'s S.M.F. ¶ 23.) When he assumed Mrs. Schmidt's care, Dr. Mechtenberg was aware that a urinalysis had been performed, and he had the basic urinalysis results available to him on July 7th. (Pl.'s S.M.F. ¶¶ 24-25). In addition, Dr. Mechtenberg was aware that the urine had been sent for a culture, but he did not have the results of the culture. (Pl.'s S.M.F. ¶ 26 as qualified by P.A.M.C. O.S.M.F. ¶ 26.) Dr. Mechtenberg did not assess Mrs. Schmidt to have a symptomatic urinary tract infection as of July 7, 2009. (PAMC O.S.M.F. ¶ 45.) Dr. Mechtenberg was

6

primarily concerned with Mrs. Schmidt's chronic, symptomatic, and worsening anemia. (PAMC A.S.M.F. ¶ 44; Pl.'s R.S.M.F. ¶ 44.)

Dr. Mechtenberg discharged Mrs. Schmidt the afternoon of July 7th. (Pl.'s S.M.F. ¶ 29; PAMC O.S.M.F. ¶ 29). Prior to her discharge Dr. Mechtenberg recalled discussing the urinalysis with Mrs. Schmidt, however, Dr. Mechtenberg's written discharge instructions did not mention the urinalysis results or urine culture. (Pl.'s S.M.F. ¶ 27; PAMC O.S.M.F. ¶ 27; PAMC A.S.M.F. ¶ 46 as qualified by Pl.'s R.S.M.F. ¶ 46.) When Mrs. Schmidt was discharged she was not given antibiotics. (Pl.'s S.M.F. ¶ 28; Rand O.S.M.F. ¶ 28; PAMC O.S.M.F. ¶ 28.)

On July 9, 2009, Mrs. Schmidt's urine culture results became available, and they showed greater than 100,000 CFU/ml of E. Coli bacteria. (PL.'s S.M.F. ¶¶ 30-31, Rand O.S.M.F. ¶¶ 30-31.)[6] Mrs. Schmidt's doctors, Doctors Linville, Rand, and Mechtenberg, never contacted Mrs. Schmidt to relay the results of her urine culture to her and she was not notified of the results. (Pl.'s S.M.F. ¶¶ 32, 37 as qualified by PAMC O.S.M.F. ¶ 37; Rand O.S.M.F. ¶ 37.) Dr. Linville testified that following Mrs. Schmidt's initial hospitalization she expected to see her, and she expected to receive Mrs. Schmidt's admission history and physical, any lab results, and her discharge documentation. (Rand A.S.M.F. ¶ 10.) Dr. Linville did not recall receiving the lab results. (*Id.*)

Mrs. Schmidt was re-admitted to PAMC on July 19, 2009. (Pl.'s S.M.F. ¶ 38; Rand O.S.M.F. ¶ 38.) At the time Mrs. Schmidt was admitted, Dr. Rand was the covering physician. (*Id.*) Mrs. Schmidt complained of lower leg pain, body aches and chills.[7] (*Id.*) Dr. Rand changed her assessment to urosepsis after looking at Mrs. Schmidt's lab results and noting the presence of E. coli. (Pl.'s S.M.F. ¶ 41; Rand O.S.M.F. ¶ 41.) Dr. Rand testified that Mrs. Schmidt's UTI had

---

[6] The E. Coli results are admitted as to Dr. Rand. (*See* Rand O.S.M.F. ¶ 31.) They are not admitted as to PAMC. (*See* PAMC O.S.M.F. ¶ 31.)

[7] This fact is admitted as to Dr. Rand, but not as to PAMC. (*See* Rand O.S.M.F. ¶ 38; PAMC O.S.M.F. ¶ 38.)

gotten worse when she returned to the hospital, but Dr. Philip Carling, PAMC's expert witness, and Dr. Onion, Dr. Rand and Dr. Linville's expert witness, found that Mrs. Schmidt did not have a symptomatic urinary tract infection at the time of her initial hospitalization and that Mrs. Schmidt's condition on July 19, 2009 did not result from an untreated UTI. (Pl.'s S.M.F. ¶ 39; PAMC O.S.MF. ¶ 39.) Mrs. Schmidt had sepsis on July 19, 2009. (Pl.'s S.M.F. ¶ 40 as qualified by PAMC O.S.M.F. ¶ 40.) Mrs. Schmidt's discharge summary states that she was admitted on July 19, 2009 with acute urosepsis. (Pl.'s S.M.F. ¶ 42; Rand O.S.M.F. ¶ 42.) Following Mrs. Schmidt's death, the final diagnoses included "'sepsis syndrome, genitourinary, Gram-negative form, Escherichia coli.'" (Pl.'s S.M.F. ¶ 42; Rand O.S.M.F. ¶ 42.) [8] The cause of her sepsis is disputed. (Pl.'s S.M.F. ¶ 40; PAMC O.S.M.F. ¶ 40; Pl.'s R.S.M.F. ¶ 40.)[9]

## A. Expert witness analysis

While Dr. Carling has testified that the standard of care basically requires that a physician either follow-up on tests or have a system for following up on tests, he also stated the circumstances dictate whether a physician needs to consider the results of a urine culture and follow-up with the patient, and that in this instance the lack of evaluation of the urine culture by a physician between Mrs. Schmidt's discharge from the hospital and her re-admission was good medical practice because he deemed the culture to be of no clinical relevance. (*See* Pl.'s S.M.F. ¶ 33 as qualified by PAMC ¶ 33; PAMC A.S.M.F. ¶ 50.) Based upon Mrs. Schmidt's presentation on the 6th and the 7th, Dr. Carling found there was no need for a physician to follow up on the urine culture. (PAMC A.S.M.F. ¶ 50.) Dr. Carling held that the urinalysis results from July 6th and 19th provided evidence that Mrs. Schmidt did not have an invasive urinary tract infection at

---

[8] The aforementioned two sentences relying upon the discharge summary are only admitted as to Dr. Rand. (Rand O.S.M.F. ¶ 42.) They are not admissible as to PAMC. (PAMC O.S.M.F. ¶ 42.)
[9] The court notes that a fair amount of Dr. Rohrer's deposition testimony that the Plaintiff has cited to was not included in the summary judgment record and therefore could not be considered.

8

the time. (Rand A.S.M.F. ¶ 11.) Dr. Carling believes that on July 7, 2009 Mrs. Schmidt did not have a symptomatic urinary tract infection, but instead had an asymptomatic bacteruria or asymptomatic infection. (PAMC A.S.M.F. ¶ 47-48.) Dr. Carling also found that Mrs. Schmidt did not have a symptomatic urinary tract infection on July 19, 2009. (PAMC A.S.M.F. ¶ 51.)

Dr. Onion also found that Mrs. Schmidt did not have a symptomatic urinary tract infection on July 6-7. (PAMC A.S.M.F. ¶ 53.) Dr. Onion held that Mrs. Schmidt's presentation to Parkview did not show signs or symptoms that would indicate a urinary tract infection to a physician. (PAMC A.S.M.F. ¶ 54.) Dr. Onion listed the symptoms of a symptomatic lower urinary tract infection as dysuria, painful urination, frequency, incontinence, and delirium, and noted that an upper urinary tract infection can also include fever and pain. (Rand A.S.M.F. ¶ 15 as qualified by Pl.'s R.S.M.F. ¶ 15.)

Dr. Carling and Dr. Onion's opinions that Mrs. Schmidt did not have a symptomatic urinary tract infection are disputed by Plaintiff's expert witness, Dr. Rohrer. (Pl.'s R.S.M.F. ¶¶ 48, 54; Pl.'s R.S.M.F. ¶ 15.)

Dr. Onion opined that a physician must know the results of a test and must make a determination whether the patient should be called based on the test results. (Pl.'s S.M.F. ¶ 34.) Dr. Onion explained that physicians apply a level of urgency to an abnormal test result and then determine how to follow-up. (Rand A.S.M.F. ¶ 14.) Dr. Onion also testified more specifically that in this case, the standard of care would have required that a physician follow up on the urine culture results within a few weeks. (PAMC O.S.M.F. ¶ 34; *see also* PAMC A.S.M.F. ¶ 55; *see also* Rand A.S.M.F. ¶¶ 13-14.)

Dr. Onion opined that antibiotic treatment in asymptomatic urinary tract infections does not eliminate the infection, prevent the infection's recurrence, or diminish symptoms. (PAMC

9

A.S.M.F. ¶ 56; Rand A.S.M.F. ¶ 15.) Dr. Onion believes that antibiotic treatment started earlier would not have made a difference for Mrs. Schmidt. (PAMC A.S.M.F. ¶ 57.)

Dr. Rohrer has stated Dr. Linville deviated from the standard of care because the urinalysis and urine culture results were never noted nor conveyed to Mrs. Schmidt. (Pl.'s S.M.F. ¶ 35 as qualified by PAMC O.S.M.F. ¶ 35; Rand O.S.M.F. ¶ 35.) He also felt that Dr. Rand was obligated to follow up on the laboratory results. (*See* Pl.'s R.S.M.F. ¶ 2.) Dr. Rohrer has stated that the standard of care requires follow up on lab results and the prescription of appropriate treatment. (Pl.'s R.S.M.F. ¶ 14.)

The expert witnesses also had differing opinions regarding Mrs. Schmidt's sepsis. Dr. Carling believes that the sepsis was not caused by a urinary tract infection. (PAMC A.S.M.F. ¶ 52.) Dr. Carling concluded that on July 19th Mrs. Schmidt was septic and bacteremic with E. coli in her blood, and that following a period of improvement she died of a relapse of multi-organ failure. (Rand A.S.M.F. ¶ 12.) Dr. Rohrer opined that Mrs. Schmidt suffered from E. coli urinary tract infection and E. coli bacteremia, which progressed to E. coli septicemia, ultimately causing a systemic inflammatory response syndrome resulting in multi-organ failure. (Pl.'s R.S.M.F. ¶ 58.) Dr. Onion does not believe that Mrs. Schmidt died as a result of a urinary tract infection. (PAMC A.S.M.F. ¶ 58.)

## II. STANDARD OF REVIEW:

"Summary judgment is appropriate when the record reveals no issues of material fact in dispute. A fact is material if it has the potential to affect the outcome of the case." *Lepage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 9, 909 A.2d 629 (citations omitted).

The Law Court has held that "[s]ummary judgment is properly granted if the facts are not in dispute or, if the defendant has moved for summary judgment, the evidence favoring the

10

plaintiff is insufficient to support a verdict for the plaintiff as a matter of law." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18; *see also Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757. "Even when one party's version of the facts appears more credible and persuasive to the court, a summary judgment is inappropriate if a genuine factual dispute exists that is material to the outcome. " *Arrow Fastener Co., Inc. v. Wrabacon, Inc.*, 2007 ME 34, ¶ 17, 917 A.2d 123.

When considering a Motion for Summary Judgment, this court must admit uncontroverted facts from the statement of material facts that are properly supported. M.R. Civ. P. 56(h)(4). This court cannot consider parts of the record that were not properly referenced in a statement of material facts. *See* M.R. Civ.P. 56(h)(4) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."); *see also HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶ 17, 28 A.3d 1158.

III.    DISCUSSION:

"'[T]o establish liability in a medical malpractice case, the plaintiff must show that the defendant's departure from a recognized standard of care was the proximate cause of the injury.'" *Merriam v. Wanger*, 2000 ME 159, ¶ 8, 757 A.2d 778 (quoting *Phillips v. Eastern Maine Med. Ctr.*, 565 A.2d 306, 307 (Me.1989)) (alterations in the original). The Law Court has held that:

> A poor result, standing alone, is insufficient to establish liability. . . . [T]he plaintiff must prove that the poor result was caused either by the defendant's lack of that degree of skill and knowledge ordinarily possessed by physicians in his branch of medicine, or, by his failure to exercise his best judgment in the application of that skill, or, by his failure to use ordinary care in performing the operation or in administering the treatment involved.

*Downer v. Veilleux*, 322 A.2d 82, 87 (Me. 1974). "'The physician is not an insurer. He does not warrant favorable results. If he possesses ordinary skill, uses ordinary care, and applies his best

11

judgment, he is not liable even for mistakes in judgment." *Downer v. Veilleux*, 322 A.2d 82, 86 (Me. 1974) (quoting Coombs v. King, 1910, 107 Me. 376, 378, 78 A. 468, 469).

In *Cox v. Dela Cruz*, 406 A.2d 620, 622 (Me. 1979), the Law Court explained that in most instances the plaintiff can meet her burden of proof "through expert medical testimony establishing: (1) the appropriate standard of medical care, (2) the defendant departed from that recognized standard, and (3) the conduct in violation of the standard was the proximate cause of the plaintiff's injury." "Whether an expert's testimony accurately reflects the applicable standard of care is a question of fact." *Welch v. McCarthy*, 677 A.2d 1066, 1070 n. 3 (Me. 1996).

## A. Dr. Rand

This case has proceeded through the pre-litigation screening panel. Pursuant to 24 M.R.S.A. § 2857(1)(C), those findings are now admissible. (24 M.R.S.A. § 2857 found unconstitutional on other grounds not applicable here as asymmetrically applied in *Smith v. Hawthorne*, 2006 ME 19, 892 A.2d 433.) Maine Law provides " If the unanimous findings of the panel as to either section 2855, subsection 1 or 2, are in the negative, the claimant must release the claim or claims based on the findings without payment or be subject to the admissibility of those findings under section 2857, subsection 1, paragraph B." 24 M.R.S.A. § 2858(2). In addition, to determining the issues of proximate causation and comparative negligence, the panel is required to determine "Whether the acts or omissions complained of constitute a deviation from the applicable standard of care by the health care practitioner or health care provider charged with that care." 24 M.R.S.A § 2855(1)(A). At the panel hearing, the plaintiff is required to show negligence and proximate causation by a preponderance of the evidence. § 2855(2). On the issue of the standard of care provided by Dr. Rand, the panel found that Dr. Rand had not deviated from the standard of care.

12

Because the panel members found in her favor on both the standard of care and causation issues, Dr. Rand contends that the panel's findings automatically defeat Plaintiff's Motion for Summary Judgment. The court disagrees that the panel findings automatically defeat Plaintiff's Motion, but acknowledges that the panel findings may have a material impact on the fact finder at trial. The court is aware that the fact finder is to perform her own analysis *See Alexander* § 7-76, however, the panel's findings can be a part of that analysis. In *Smith v. Hawthorne*, the Law Court noted that panel findings "were highly probative and relevant to the jury's determination of material questions of fact." 2006 ME 19, ¶ 22, 892 A.2d 433, 439. As important as the panel findings may prove to a jury, however, they are not the determinative factor for purposes of this Motion.

The court finds that summary judgment cannot be granted to the Plaintiff as the expert testimony conflicts regarding what the standard of care required of Dr. Rand. While the Plaintiff has argued that Dr. Rand violated the standard of care by failing to review the test results and convey the results to Mrs. Schmidt, the summary judgment record also fails to conclusively establish that it was Dr. Rand's responsibility to review the urinalysis results and decide upon a course of treatment within a certain time frame.

Dr. Rand contends that her treatment of Mrs. Schmidt met the standard of care. Dr. Rand has outlined her standard practices and responsibilities and has emphasized that the hospitalist is responsible for managing the patient. She expected Dr. Mechtenberg to review Mrs. Schmidt's test results when he took over her care. (Pl.'s S.M.F. ¶ 23.) Dr. Mechtenberg's own testimony indicates that as a hospitalist his role was to care for the patient from admission to discharge. (Pl.'s S.M.F. ¶ 20; Rand A.S.M.F. ¶ 16.) Dr. Rand did not in fact view the lab results until Mrs. Schmidt returned to the hospital.

13

While Plaintiff's expert, Dr. Rohrer, believes that Dr. Rand violated the standard of care by failing to follow up on Mrs. Schmidt's lab results, portions of both Dr. Carling and Dr. Onion's testimony are supportive of Dr. Rand. Both Dr. Onion and Dr. Carling do not believe that Mrs. Schmidt had a symptomatic urinary tract infection. Mrs. Schmidt's initial hospital visit was for her anemia and according to Dr. Onion her presentation did not indicate a urinary tract infection. (PAMC A.S.M.F. ¶ 54.) Dr. Carling found the urine culture to be of no clinical relevance and did not think that it required follow-up. Dr. Onion found that in this case the standard of care would have necessitated follow-up on the urine culture results within a few weeks. (PAMC O.S.M.F. ¶ 34; *see also* PAMC A.S.M.F. ¶ 55; *see also* Rand A.S.M.F. ¶¶ 13-14.) The court is not allowed to select which expert's opinion appears to be more credible at the summary judgment stage. The Law Court has held that "Such an assessment of the weight or credibility to be given evidence is impermissible on a motion for summary judgment." *Levesque v. Chan*, 569 A.2d 600, 602 (Me. 1990).

Dr. Rand has shown that at trial she will be able to present not only her own testimony, but also expert testimony indicating that she did not breach the standard of care. While the Plaintiff has presented contrary evidence, viewed in the light most favorable to the non-moving party, Dr. Rand's and the experts' testimony raises genuine issues of material fact for trial, which preclude summary judgment.

**B. PAMC**

As an initial matter, the court acknowledges that PAMC disputed the vast majority of Plaintiff's statements and raised important evidentiary objections to some of the materials and testimony relied upon by the Plaintiff in this Motion, which only served to weaken the Plaintiff's Motion with respect to PAMC.

PAMC argues that partial summary judgment should not be granted in this case as the standard of care and causation are both disputed. PAMC contends that the Plaintiff has not established the requisite standard of care, as it is required to do. *See Levesque v. Chan*, 569 A.2d 600, 601 (Me. 1990) (quoting *Forbes v. Osteopathic Hospital of Maine*, 552 A.2d 16, 17 (Me.1988)) ("'[O]rdinarily, a plaintiff can discharge his burden of proof for a claim of negligent medical care only by expert medical testimony establishing the appropriate standard of medical care, that the defendant departed from the standard and that the negligent conduct proximately caused the plaintiff's injury.'"). PAMC states that Plaintiff's motion does not cover the full standard of care issue. Instead of whether the physicians' failures to communicate the lab results to Mrs. Schmidt constituted a departure from the standard of care, PAMC asserts that the standard of care question should really be "whether Mrs. Schmidt had a symptomatic urinary tract infection that should have been treated with antibiotics as a result of her admission to Parkview on July 6-7, 2009." (PAMC Opp. 6.) Plaintiff asserts that the issue of communication of the test results is the pivotal issue, and that both Dr. Rand and Dr. Mechtenberg were responsible for communicating the test results to Mrs. Schmidt.

The court agrees that Plaintiff's Motion seems to circumscribe the standard very narrowly, however, it is unnecessary to reach this issue since even using this narrow standard the Plaintiff's Motion cannot be granted. As already described in the context of Dr. Rand, this court finds that whether PAMC deviated from the standard of care is disputed based upon conflicting expert testimony.

The court notes that PAMC has also raised an additional factual dispute that precludes summary judgment in this case: the issue of whether Dr. Mechtenberg discussed the results of Mrs. Schmidt's urinalysis test with her prior to her discharge from the hospital. Plaintiff contends

15

that Dr. Mechtenberg did not discuss the results of Mrs. Schmidt's test with her prior to her discharge, and PAMC contends that he did, although that conversation was not memorialized in writing. The deposition testimony from Dr. Mechtenberg on the issue is somewhat unclear. (*See* Pl.'s S.M.F. ¶ 27; PAMC O.S.M.F. ¶ 27; PAMC A.S.M.F. ¶ 46 as qualified by Pl.'s R.S.M.F. ¶ 46.) A decision about whether or not Dr. Mechtenberg communicated the urinalysis results to Mrs. Schmidt should be made by the fact-finder at trial, not by this court at summary judgment.

Accordingly, the court **ORDERS** that Plaintiff's Motion for Summary Judgment on the issue of violation of the standard of care is DENIED as to both Dr. Rand and PAMC. Plaintiff's Motion for Factual Findings at Trial is also DENIED.

The clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: _February 17, 2015_

_____
Hon. Roland A. Cole
Justice, Superior Court

16

Daniel Rapaport Esq.
PO Box 9546
Portland ME 04112

↑

Melanie Rand DO
Cortney Linville DO


Celine Boyle Esq.
PO Box 1179
Saco ME 04072

↑

Plaintiff


Philip Coffin III Esq.
PO Box 15215
Portland ME 04112

↑

Parkview Adventist
Medical Center